OPINION
Robert Seelig was found guilty of rape and attempted sexual battery by a jury in the Clark County Court of Common Pleas. The trial court sentenced Seelig to ten years on the rape charge and eighteen months on the attempted sexual battery charge and ordered that the two sentences be served consecutively. Seelig appeals from this conviction, raising three assignments of error.
The state's evidence established the following facts.
Seelig began living with the victim and her mother when the victim was approximately one to two years old. At the time of trial, the victim was sixteen years old. Seelig had been involved in virtually her whole life, and she had referred to him as "Daddy."
On March 12, 2000, the victim told her youth pastor at church that Seelig had been sexually abusing her, and the allegations were reported to the Clark County Department of Human Services, which began an investigation. The victim was interviewed on March 21, 2000 at her high school. She told the interviewing detective, Detective Davidson, of the abuse and told him that Seelig had a mole on the left side of his penis.
On March 23, 2000, Detective Davidson interviewed Seelig. Seelig denied that there had been sexual abuse, that the victim had ever seen him naked, and that she had ever seen his mole. After Detective Davidson eventually informed Seelig of the precise nature of the victim's allegations, the following exchange occurred:
DETECTIVE DAVIDSON: But she's lying about this.
THE DEFENDANT: I didn't say that. I didn't say that.
DETECTIVE DAVIDSON: Somebody is.
 THE DEFENDANT: No. It's, you know, no — okay. She's not lying. Okay. I mean, what else — I mean, I don't know what to say. I don't know how to put it. I don't know where she's coming from.
 DETECTIVE DAVIDSON: Well, either she's lying about it; or you're lying about it.
THE DEFENDANT: Yes, sir.
 DETECTIVE DAVIDSON: It's that simple. She's saying it happened. Are you now telling me maybe it did?
THE DEFENDANT: No, it didn't.
 DETECTIVE DAVIDSON: Well, you said she's not lying. Maybe I'm confused.
 THE DEFENDANT: No, you're not confused. I did not do anything to that girl and —
DETECTIVE DAVIDSON: Well, then she must be lying about it.
(Emphasis added). Seelig went on to deny several more times that any sexual abuse had ever occurred.
Seelig was subsequently indicted on June 5, 2000 on one count of gross sexual imposition, one count of rape, and one count of attempted sexual battery. He was arrested on June 16, 2000, and he pled not guilty at his arraignment. The gross sexual imposition count was later dismissed by the state.
At trial, the victim testified that Seelig had made her perform oral sex on him once when she was eleven or twelve years old and that he had attempted to make her perform oral sex on him when she was fifteen years old. She testified that, during the first incident, she had seen Seelig's mole and that she had told Detective Davidson about the mole and its location during his questioning of her. She also testified regarding a conversation she had had with Seelig and her mother during which Seelig had stated that he had a mole on his "private area." The victim's mother also testified to the conversation. The state then presented the testimony of Detective Davidson regarding his investigation and the testimony of Sergeant Michael Hatas, who had photographed Seelig's penis and noted the location of the mole on the photograph.
The defense called two witnesses. The first, James Bond, claimed to have been present at the conversation in which Seelig told the victim that he had a mole on his "private area." Bond testified that Seelig gestured to the left with his hand. The second, Bill Hays, whom the victim had testified came to the house and let himself in during the second incident while Seelig was asking her to perform oral sex on him, testified that he had spoken to Seelig on the phone before coming over and that he only let himself in because Seelig was expecting him.
The jury found Seelig guilty on both the rape and attempted sexual battery counts on January 31, 2001. On February 14, 2001, the trial court sentenced Seelig as described above.
Seelig raises three assignments of error.
 I. THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE COURT OVERRULED THE MOTION OF DEFENSE COUNSEL FOR A MISTRIAL.
Under this assignment of error, Seelig argues that the trial court erred in admitting the following testimony from the victim regarding other acts of sexual abuse for which Seelig was not charged:
 Q. * * * [D]o you know when this would have occurred in relation to when you started your period?
 A. It was — it was a few months after I started my period. I remember being on my period at the time.
 Q. How do you remember being on your period at the time this incident, you just testified to, occurred?
 A. Because otherwise he would have — otherwise, it would have been a different kind of molestation. Otherwise, he would have rubbed his penis on my vagina. That's what he wanted to do. That's what he was going to do.
 Q. How do you know — how do you know that is what he was going to do?
MR. MAYHALL: Objection.
MR. RASTATTER: Let me phrase it.
THE COURT: I'm sorry. What was the objection?
MR. RASTATTER: I'll rephrase the question.
 MR. MAYHALL: My objection was — the question was why did he do something, and I objected because that's a speculation.
 MR. RASTATTER: I think my question was: How did you know? She said he was going to do that. How did you know?
THE COURT: She can answer the question.
A. Because previously —
MR. RASTATTER:
 Q. Well, let me stop you there. Let me ask you the question this way. Did you — did he say to you that that is what he wanted to do?
 A. Not specifically. But because of things that had happened in the past, I knew that that's what he wanted to do.
MR. MAYHALL: Objection. Can we approach?
THE COURT: Yes.
 MR. MAYHALL: Your Honor, I object at this point. I move for a mistrial.
THE COURT: Overruled.
(Emphasis added).
Evid.R. 404(B) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
The state does not argue that the other acts testimony was admissible under any of the circumstances listed in Evid.R. 404(B). Rather, it concedes that it was error to admit the testimony, arguing, "Although in the case sub judice the victim's testimony alluded to incidents where Appellant sexually molested her for which he was not on trial, the error was harmless because there is no possibility that said unlawful testimony contributed to Appellant's conviction." (Emphasis added). We agree with the state that the trial court erred in admitting the other acts testimony. Therefore, we must determine whether that error was harmless, as the state argues.
"Error in criminal proceedings is harmless only if there is no reasonable possibility that the error may have contributed to the accused's conviction." State v. Sinkfield (Oct. 2, 1998), Montgomery App. No. 16277, unreported, citing Chapman v. California (1967),386 U.S. 18, 23-24, 87 S.Ct. 824, 827-28. The state argues that the testimony was harmless for several reasons. First, it argues that, whether the victim testified to one incident or many incidents, the jury still had to decide whether to believe her. Second, it argues that the testimony could not have inflamed the jury because she did not testify about any details. Third, it points out that the testimony was not mentioned in the state's closing argument. Finally, it argues that the evidence against Seelig was overwhelming, especially considering the testimony about the mole and his statement that the victim was not lying.
We do not agree with the state's argument that the error was harmless. This case essentially comes down to which person the jury believed, and the victim's testimony that Seelig had abused her on more occasions may have been the factor that caused the jury to believe her. We cannot conclude that testimony of sexual abuse involving the vagina could not have inflamed the jury. Although the victim did not go into great detail, she did essentially testify that there had been vaginal abuse in the past. As Seelig was charged only with incidents involving oral intercourse or attempted oral intercourse with the victim, testimony of vaginal intercourse or sexual abuse involving the vagina could very well have inflamed the jury. Finally, we cannot conclude, as the state would have us do, that the evidence against Seelig is so overwhelming that he would have been convicted absent the other acts testimony. Neither the mole evidence nor Seelig's statement that the victim was not lying are as definitive as the state claims. The victim's alleged observation of the mole was refuted by evidence that Seelig had told the victim that he had a mole in his genital area. The victim admitted that this conversation had occurred, and there was testimony that Seelig may have gestured to the left. This evidence is therefore not "overwhelming" evidence of Seelig's guilt, as the state contends. With regard to Seelig's statement that the victim was not lying, it appears to us to be taken out of context. At best, it is still far from a conclusive admission of guilt. For the above reasons, we decline to find that the trial court's error in admitting the other acts testimony was harmless.
The first assignment of error is sustained.
 II. PROSECUTORIAL MISCONDUCT DURING TRIAL AND IN CLOSING ARGUMENTS DEPRIVED THE DEFENDANT OF A FAIR TRIAL.
Under this assignment of error, Seelig argues that the prosecutor committed misconduct in several situations throughout the trial. Specifically, Seelig argues that the prosecutor questioned witnesses with the intention of eliciting inadmissible testimony and that the prosecutor vouched for the victim's credibility during closing arguments. With regard to the alleged misconduct in questioning witnesses, Seelig points to two incidents during the direct examination and re-direct examination of Detective Davidson. In the first instance, Seelig points to the following exchange during the prosecutor's direct examination of Detective Davidson:
 Q. Detective Davidson, can you describe for us what [the victim's] demeanor was at the time of that interview on March 21, 2000?
MR. MAYHALL: Objection
THE COURT: Approach the bench, please.
 MR. MAYHALL: I object on the grounds of relevance what the demeanor was on March 21.
THE COURT: That was a fair question.
MR. RASTATTER: Well, I think it is relevant.
THE COURT: Based on?
 MR. RASTATTER: Well, my opinion that the evidence is relevant is based upon the fact that this is the investigating officer. And although he's not able to testify as to what his opinion is on her truthfulness as he is pursuing his investigation, he's constantly making determination as to whether or not he's receiving reliable information. And I think a witness' demeanor at the time she reports something to the police is pretty important to what-as to whether or not he should further his investigation. I am not going to ask him —
 THE COURT: All right. He can't testify as to what he observed demeanor but don't get into that (sic).
MR. RASTATTER: I won't.
BY MR. RASTATTER:
 Q. All right. Detective Davidson, can you answer the question, please?
A. Could you repeat the question?
 Q. Yes. Could you describe for us what [the victim's] demeanor was during this interview on March 21, 2000?
 A. She was visibly upset and crying. She at one point voiced her concerns for —
 MR. MAYHALL: Objection. What she voiced would be hearsay, Your Honor.
THE COURT: Any response?
MR. RASTATTER: I would agree with that, Your Honor.
THE COURT: So do I. Sustained.
BY MR. RASTATTER:
 Q. Detective Davidson, based on your observations of [the victim] was she anxious to tell you about what happened?
MR. MAYHALL: Objection.
THE COURT: Sustained.
BY MR. RASTATTER:
Q. Did you observe any reluctance on her part?
MR. MAYHALL: Objection.
THE WITNESS: Yes, Sir.
 THE COURT: Mr. Rastatter, how was your second question different from the first one that I sustained the objection to?
MR. RASTATTER: I am not so sure that it was, Your Honor.
 THE COURT: The objection is sustained and the jury will disregard the answer.
The next exchange to which Seelig points occurred on the re-direct examination of Detective Davidson:
 Q. Now showing you the page of the transcript where the Defendant says she's not lying, can you tell the ladies and gentlemen of the jury how many pages later that comes after you informed the Defendant of the allegations made against him?
A. Okay. There appear to be two transcripts.
 Q. If you would count the pages for us and let us know how many pages.
A. Count the pages?
MR. MAYHALL: Your Honor, this appears on the tape.
MR. RASTATTER: Your Honor, I think —
MR. MAYHALL: How many pages?
MR. RASTATTER: Well, defense counsel —
MR. MAYHALL: That's fine, I have no objection.
THE WITNESS: The page you showed me by my count is
BY MR. RASTATTER:
Q. Okay.
A. Of this document.
 Q. Well, is — there's no question then that you had informed him of the sexual allegations made against him, that they were being made by [the victim] and that you informed him of that before he told you she's not lying?
 A. That is correct. Later on in the interview I named the specific things she had told us.
MR. MAYHALL: I am going to object, Your Honor.
 THE COURT: I am going to sustain the Objection, his response was not to the question.
MR. RASTATTER: I agree.
THE COURT: The jury will disregard that answer.
MR. RASTATTER: Maybe my question wasn't very clear.
 MR. MAYHALL: Your Honor, I move this redirect be terminated, given this witness' misconduct.
MR. RASTATTER: Misconduct?
 MR. MAYHALL: He's been testifying for twenty-eight and a half years, he knows better than to make an answer like that.
MR. RASTATTER: I think — I think my question was ambiguous.
 THE COURT: I don't think it was and I don't think the answer was to the question that was asked. And the witness will be instructed to respond only to the questions asked and the jury will be instructed to disregard his last answer. Continue, please.
We quote these two exchanges cited by Seelig in his brief because we cannot determine exactly what he contends the prosecutor did wrong. He cites no law to support his contention of prosecutorial misconduct arising from these incidents. In fact, he gives no explanation of why the above two exchanges rise to the level of prosecutorial misconduct. We believe that they do not.
The third incident to which Seelig refers occurred during the prosecutor's closing argument. Seelig argues that the prosecutor vouched for the victim's credibility during his closing argument. However, the prosecutor did not vouch for the victim's credibility; he merely cited to facts that he argued supported her testimony. These included her demeanor on the witness stand, her actions, Seelig's statement that she was not lying, Seelig's statement to the victim's mother that the case would be dismissed for lack of evidence, and the evidence about the mole. Nothing in the prosecutor's argument constituted "vouching" for the victim's credibility. The prosecutor was entitled to recite evidence which he believed made the victim appear credible. Thus, this incident does not rise to the level of prosecutorial misconduct.
The second assignment of error is overruled.
 III. THE SENTENCING OF DEFENDANT TO CONSECUTIVE MAXIMUM TERMS OF IMPRISONMENT WAS IMPROPER, ARBITRARY, AND UNJUST.
Under this assignment of error, Seelig argues that the trial court failed to make the findings required to impose consecutive sentences under R.C. 2929.14(E)(4).
R.C. 2929.14(E)(4) provides:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
* * *
The trial court made all of these required findings in its February 24, 2001 judgment entry, wherein it stated:
 Pursuant to Revised Code Section 2929.14(E), the Court finds for the reasons stated on the record that consecutive sentences are necessary to protect the public from future crime or to punish the defendant and not disproportionate to the seriousness of the defendant's conduct and the danger the defendant poses to the public.
 The Court also finds that the defendant committed the crime of Attempted Sexual Batter (sic), while he was under a community control sanction.
However, the trial court focused only on the attempted sexual battery charge when finding that Seelig was under a community control sanction. We read R.C. 2929.14(E)(4)(a) to require that the offender have been under a sanction when committing each of the offenses for which he is being sentenced consecutively. The trial court made no finding, and we cannot discern from the record, whether Seelig was under a sanction at the time of the incident giving rise to the rape charge. As this issue may become relevant in the event that Seelig is again convicted of attempted sexual battery and rape, we must find that the trial court erred in sentencing Seelig to consecutive sentences if only the attempted sexual battery was committed while Seelig was under a community control sanction.
The third assignment of error is sustained.
The judgment of the trial court will be reversed, and this matter will be remanded for a new trial.
BROGAN, J. and FAIN, J., concur.